1      UNITED STATES DISTRICT COURT
2        DISTRICT OF PUERTO RICO

3  CENTENNIAL PUERTO RICO LICENSE
4  CORPORATION,

5      Plaintiff,                    Civil No. 08-2436 (JAF)

                                      Consolidated with:
6      v.                             Civil No. 09-1002 (JAF)

7  TELECOMMUNICATIONS REGULATORY
8  BOARD OF PUERTO RICO, et al.,
9
10      Defendants.


11                      **OPINION AND ORDER**

12       This case consolidates two, one filed by Centennial Puerto Rico

13  License Corporation ("Centennial") and one by Puerto Rico Telephone

14  Company, Inc. ("PRTC") (Civil No. 09-1002). (See Docket No. 18.[1])

15  Each seeks judicial review of certain determinations made by a

16  Commonwealth agency, the Telecommunications Regulatory Board of

17  Puerto Rico, and its members, in their professional capacities,

18  Miguel Reyes-Dávila, Vicente Aguirre-Iturrino, and Nixyvette Santini-

19  Hernández (collectively, "the Board"), alleging violations of, inter

20  alia, the federal Telecommunications Act of 1996 ("TCA"), 47 U.S.C.

21  §§ 251-261; applicable rules and rulings of the Federal

22  Communications Commission ("FCC"); and the Puerto Rico

23  Telecommunications Act of 1996 ("Law 213"), 27 L.P.R.A. §§ 267-272

24  (2009). (Docket No. 1; Civil No. 09-1002 Docket No. 1.)

---

[1] Unless otherwise noted, docket citations refer to Civil No. 08-2436.

Civil No. 08-2436 (JAF)                                              -2-

1          PRTC, the Board, and Centennial, separately, move for summary

2    judgment. (Docket Nos. 25; 27; 30.)  All agree that summary judgment

3    is proper, but they differ on matters of law.  (See Docket No. 22.)

                                    I.

                               **Jurisdiction**

6          Pursuant to 28 U.S.C. § 1331, this court has jurisdiction over

7    the parties' federal law claims.  See Verizon Md. Inc. v. Pub. Serv.

8    Comm'n, 535 U.S. 635, 643-44 (2002).  Pursuant to 28 U.S.C. § 1367,

9    this court also has jurisdiction over the parties' related Puerto

10   Rico law claims.[2]

                                    II.

                     **Factual and Procedural History**

13         PRTC and Centennial are telecommunications carriers in Puerto

14   Rico.  (See  Joint  Ex.  39  at  1-2.[3])  Both  provide  local

15   telecommunications services within Puerto Rico, which renders them

16   local exchange carriers ("LECs") under the TCA.  (Id.)  The Board is

_____

        [2] Section 269d of Law 213 mirrors the language of the TCA in reserving
to this court review of the Board's determinations made under Law 213. See
47 U.S.C. § 252; 27 L.P.R.A. § 269d(e)(5). We question the validity of this
jurisdictional allocation, as it appears to impose on this court a duty to
adjudicate claims arising under Commonwealth law, in contravention of
federal law. See U.S. Const. art. III, § 2; see also, e.g., Burford v. Sun
Oil Co., 319 U.S. 315, 317 (1943) (noting that state legislature may not
expand jurisdiction of federal district court). We, nevertheless, review
the parties' Puerto Rico law claims because, having supplemental
jurisdiction under 28 U.S.C. § 1367, we assume the position of a
Commonwealth court with plenary power to adjudicate claims arising under an
otherwise valid Commonwealth statute.

        [3] The parties submitted joint exhibits via compact disc under seal.
(See Docket No. 24.)

1    a Commonwealth agency charged with implementing federal and Puerto

2    Rico telecommunications law. (Id.)

3         In 2005, PRTC and Centennial completed two interconnection

4    agreements ("2005 Agreements") that governed connections between the

5    two companies for the provision of land-line and wireless

6    telecommunications services within Puerto Rico. (See, e.g., Docket

7    No. 1 at 1-2.) In 2008, they renegotiated their agreements ("2008

8    Agreements"), and the terms of the 2008 Agreements are the subject of

9    the instant dispute. (See id.)

10        During said renegotiation, PRTC and Centennial reached an

11   impasse on various issues, which they then submitted to the Board for

12   arbitration, in accordance with 47 U.S.C. § 253(b) and 27 L.P.R.A.

13   § 269d. (See id. at 4.) Concluding the arbitration, the Board

14   resolved all outstanding issues in an order dated August 8, 2008

15   ("Order") (Joint Ex. 39). PRTC and Centennial each moved the Board

16   to reconsider portions of its Order; the Board obliged and, on

17   November 25, 2008, rendered a decision retaining in part and

18   reversing in part its earlier decision ("Order on Reconsideration")

19   (Joint Ex. 49). On January 7, 2009, Centennial and PRTC each filed

20   suit in this court seeking review of certain issues, described infra

21   Part IV.B, that the Board decided in its Order and Order on

22   Reconsideration. (See Docket No. 1; Civil No. 09-1002 Docket No. 1.)

23        PRTC, the Board, and Centennial, separately, now move for

24   summary judgment. (Docket Nos. 25; 27; 30.) While all agree that

Civil No. 08-2436 (JAF)                                              -4-

1    summary judgment is proper in this case (Docket No. 22), the Board
2    opposes the legal conclusions drawn in PRTC's and Centennial's
3    motions (Docket No. 36); Centennial opposes the legal conclusions
4    drawn in PRTC's and the Board's motions (Docket No. 37); and PRTC
5    opposes the legal conclusions drawn in the Board's motion (Docket
6    No. 39) and in Centennial's motion (Docket No. 40).  Further, PRTC
7    replies to Centennial's and the Board's oppositions to its motion
8    (Docket No. 53); Centennial replies to PRTC's opposition to its
9    motion (Docket No. 54); and the Board responds to said replies
10   (Docket No. 63).

11                                **III.**

12                  **Summary Judgment Under Rule 56(c)**

13       We grant a motion for summary judgment "if the pleadings, the
14   discovery and disclosure materials on file, and any affidavits show
15   that there is no genuine issue as to any material fact and the movant
16   is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).
17   In this case, the parties stipulate that there is no genuine issue of
18   material fact requiring a trial. (Docket No. 22 at 2.) Thus, the sole
19   question for our consideration is which party is entitled to judgment
20   as a matter of law.

1                                  **IV.**

2                              **Analysis**

3  **A.   Standard of Review**

4        We review de novo a state agency determination based on federal

5  law.  <u>Global NAPs, Inc. v. Verizon New Eng., Inc.</u>, 396 F.3d 16, 23

6  (1st Cir. 2005); <u>see also</u> <u>id.</u> at 23 n.7 (declining to apply

7  deferential review to state agency's determination under the TCA).

8  Where the state agency determination is based on state law, we review

9  same with due deference to the agency's superior knowledge of its

10 governing statute.  <u>See</u> <u>WorldNet Telecomms., Inc. v. P.R. Tel. Co.</u>,

11 497 F.3d 1, 11 (1st Cir. 2007) ("Although the Board's authority under

12 local law is a legal issue, it is customary where any doubt exists to

13 give some deference to the agency charged with administering the

14 statute.").

15       Where no error of law is alleged, we review a state agency's

16 determination under the arbitrary and capricious standard. <u>See</u> <u>Global</u>

17 <u>NAPs</u>, 396 F.3d at 23 n.7. An agency's determination is deemed

18 arbitrary and capricious where the agency fails to "examine the

19 relevant data and articulate a satisfactory explanation for its

20 action including a rational connection between the facts found and

21 the choice made."  <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State</u>

22 <u>Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) (internal quotation

23 marks omitted).

Civil No. 08-2436 (JAF)                                            -6-

1    **B.    Disputed Issues**

2        PRTC disputes two decisions the Board made in its Order or Order

3    on Reconsideration, while Centennial disputes three others. We

4    consider each in turn.

5        **1.    Erroneous-Billing Fee**

6        This issue concerns whether the Board erred in accepting

7    Centennial's proposal that the 2008 Agreements either include an

8    erroneous-billing fee or eliminate a late-payment fee. We derive the

9    following summary from the parties' submissions on this issue. (See

10   Docket Nos. 26 at 6-21; 28 at 9-10, 22-23; 36 at 4-11; 37 at 6-11; 39

11   at 5-10; 53 at 4-14; 63 at 1-7; Joint Exs. 39 at 6-9; 49 at 9-10;

12   Civil No. 09-1002 Docket No. 1 at 6-7, 17-18.)

13       In their 2005 Agreements, PRTC and Centennial agreed to late-

14   payment fees on bills due one another as follows: Where the billing

15   party demanded payment and the billed party disputed the charge, the

16   billed party would hold payment in escrow until the resolution of the

17   dispute. If the billing party were ultimately found entitled to the

18   disputed payment, it would receive the payment and any interest

19   accrued thereon while in escrow, plus a 15 percent late-payment fee.

20       During renegotiation, Centennial proposed elimination of the

21   late-payment fee, arguing that it was unnecessary to compensate the

22   billing party for the funds it was owed. According to Centennial,

23   the billing party was so compensated by receiving the interest earned

24   while in escrow. The late-payment fee, then, was a penalty available

Civil No. 08-2436 (JAF)                                              -7-

1    to the billing party when wronged by a billing dispute. But
2    Centennial argued that no such penalty was available to a <u>billed</u>
3    party wronged by a billing dispute, when it was erroneously billed
4    and wrongfully required to hold funds in escrow. At the very least,
5    Centennial argued, fairness required the Board to remedy this one-
6    sided access to penalties.  Thus, Centennial proposed that if the
7    Board opted to retain the late-payment fee, it should also adopt an
8    erroneous-billing fee. This would also, according to Centennial,
9    encourage the billing party to avoid erroneous billing, which it had
10   no incentive to do under the standing scheme.

11       In its Order, the Board rejected Centennial's proposals. It
12   determined that, while penalties were currently only available to the
13   billing party, such asymmetry was justified. Unlike the billing
14   party, the billed party never rendered services for which it was
15   wrongfully forced to await payment. In its Order on Reconsideration,
16   however, the Board reversed its decision, finding that distinction
17   misleading. It adopted Centennial's reasoning and found itself
18   obliged to either create equal access to penalties or eliminate them
19   altogether. Thus, the Board's Order on Reconsideration requires PRTC
20   and Centennial to choose between those two options.

21       PRTC seeks review of the Board's decision, arguing that it
22   contravenes federal and Puerto Rico law.[4] (Docket No. 26 at 8-18.)

_____

        [4] In support of its interpretation of Puerto Rico law, PRTC
essentially makes the same arguments that it made, unsuccessfully, in a

Civil No. 08-2436 (JAF)                                                    -8-

1    Specifically, PRTC contends that the Board acted ultra vires by

2    imposing a penalty payable from one carrier to another via

3    arbitration of an interconnection agreement.[5]  (Id.)  According to

4    PRTC, substantive Puerto Rico law prohibits the Board from adopting

5    such provisions, and federal law does not allow the Board to

6    contravene state law.[6]  (See id. at 9-10.)

7        The First Circuit foreclosed PRTC's argument, however, holding

8    that "neither federal nor Puerto Rico law forbids [the imposition of]

9    incentive-based liquidated damages" by the arbitrator of an

_____

recent case in this court. See WorldNet Telecomms., Inc. v. Telecomms.
Regulatory Bd., Nos. 08-1360, 08-1359, 2009 WL 2778058, at *5-9 (D.P.R.
Aug. 25, 2009). The Board argues that PRTC is, thus, collaterally estopped
from making them again now. (Docket No. 63 at 3-5.) We decline to reject
PRTC's arguments on that ground, however, because the Board was obliged to
raise collateral estoppel as an affirmative defense in its answer, which it
failed to do (Docket No. 20 at 7-8). See Fed. R. Civ. P. 8(c).

    [5] Centennial takes issue with PRTC's characterization of the Board's
action as an "imposition" because the Board gave the carriers the option of
either adopting the erroneous-billing fee, to counterbalance the already
operative late-payment fee, or eliminating both fees altogether. (Docket
No. 37 at 9-10.) PRTC argues that this is properly understood as an
imposition because PRTC is faced with the choice of either adopting the, in
its view, unlawful penalty provision or giving up the late-payment fee to
which it believes itself legally entitled. As PRTC's argument fails even
if we consider this an imposition, we find the distinction irrelevant and
need not resolve this dispute.

    [6] The Board argues that PRTC never raised this argument during the
administrative proceedings and, thus, is precluded from doing so here.
(Docket No. 36 at 5-7.) As support for this proposition, the Board cites
authority regarding the scope of statutorily-prescribed judicial review of
federal administrative agency decisions and the scope of appellate review
of district court opinions. Such authority is irrelevant to the scope of
our review, as ours is de novo regarding a Commonwealth agency decision.
See Global NAPs, 396 F.3d at 23 n.7 (declining to review state agency
decision deferentially and noting that "the FCC, and not the individual
state commissions, is the agency with the power granted by Congress to
administer the TCA"); see also supra Part I.

1    interconnection agreement. <u>WorldNet</u>, 497 F.3d at 8. PRTC acknowledges

2    that decision but argues that the First Circuit so held without

3    regard to a Puerto Rico Court of Appeals case ("<u>Pan American</u>"[7])

4    denying the Board authority to "adopt penalty provisions that would

5    call for the payment of damages from one carrier to another."

6    (Docket No. 53 at 7, 8 n.3; <u>see</u> Docket No. 53-2 (English-language

7    translation of <u>Pan American</u>).)

8         In making this argument, PRTC conflates two separate functions

9    of the Board. In <u>Pan American</u>, the court considered whether the Board

10   could establish regulations that would impose a penalty payable from

11   one carrier to another, finding that the Board had no such authority.

12   (Docket No. 53-2 at 17-18.) That is irrelevant to the question of

13   whether the Board can arbitrate and approve penalty provisions in an

14   agreement between two carriers.  Thus, <u>Pan American</u> does not upset

15   the First Circuit's determination that neither federal nor Puerto

16   Rico law prohibits the Board's decision on this issue.

17        PRTC next argues that the Board's decision was arbitrary and

18   capricious because (1) it was contrary to evidence on the record

19   showing that the asymmetrical status of parties to a billing dispute

20   justified a late-payment fee but not an erroneous-billing fee; and

21   (2) the Board, without required explanation, switched its position on

_____

     [7] The Spanish-language version of this case is published at <u>Pan Am.</u>
<u>Tel. Co. v. Junta Reglamentadora de Telecomms.</u>, 2004 T.C.A. 1268 (P.R. Cir.
2004).

1    reconsideration based on fact findings that were inconsistent with

2    its original order. (Docket No. 26 at 18-19.)

3         PRTC showed during proceedings before the Board that the late-

4    payment fee was justified because the parties were in different

5    financial positions during the billing dispute:  The billing party

6    had rendered services for which payment was wrongfully withheld,

7    while the billed party simply had to tender funds it owed.  PRTC

8    further argued that no such asymmetry justified an erroneous-billing

9    fee, as the billed party never rendered services for which it awaited

10   payment.  Centennial refuted the latter argument, pointing out a

11   different asymmetry that existed when the billed party put funds to

12   which it was lawfully entitled into escrow while the billing party

13   lost nothing.  This other asymmetry is what Centennial proposed to

14   remedy by imposing an erroneous-billing fee, provided the Board

15   rejected Centennial's original proposal of eliminating penalties

16   altogether.

17        Centennial's logic prevailed before the Board upon

18   reconsideration.  The Board's reversal of its earlier decision is not

19   inconsistent with PRTC's showing that the parties' asymmetrical

20   position justified the late-payment fee.  It merely makes a necessary

21   and logical distinction between that showing and the different

22   asymmetry illuminated by Centennial.  The Board's final decision on

23   this point is reasonable and adequately explained in its Order on

Civil No. 08-2436 (JAF)                                              -11-

1    Reconsideration.  We reject PRTC's contention that it was arbitrary

2    and capricious.

3           **2.   <u>Requirement Regarding Direct Connection</u>**

4           This  issue  concerns  whether  the  Board  erred  in  accepting

5    Centennial's  proposal  to  require  Claro,  PRTC's  subsidiary  and

6    wireless provider, to make all "commercially reasonable efforts" to

7    connect directly to Centennial when providing wireless services.  We

8    derive  the  following  summary  from  the  parties'  submissions  on  this

9    issue. (<u>See</u> Docket Nos. 26 at 21-34; 28 at 18-20, 29-32; 36 at 18-21;

10   37 at 11-14; 39 at 10-13; 53 at 14-17; Joint Exs. 39 at 30-33; 49 at

11   10-14; Civil No. 09-1002 Docket No. 1 at 4-17.)

12          Centennial connects with Claro, PRTC's wireless subsidiary, to

13   provide  wireless  service  to  its  customers.  Under  the  TCA,  this

14   Centennial-to-Claro  interconnection  is  required,  but  they  are  not

15   required to connect directly.  That is, they are required to make at

16   least  an  indirect  connection,  which  is  done  by  connecting  through

17   PRTC.  When Centennial makes this indirect connection, PRTC charges

18   Centennial a fee; were Centennial able to connect directly to Claro,

19   no such fee would apply.

20          Centennial's proposal before the Board was to have PRTC make all

21   "commercially  reasonable  efforts"  to  connect  directly  before  PRTC

22   could charge indirect-connection fees.  While Centennial acknowledged

23   that direct connection is not required by federal law, it argued that

24   this  "efforts"  requirement  is  not  preempted  by  federal  law.

Civil No. 08-2436 (JAF)                                              -12-

1    Moreover, it argued, direct connection is faster and more efficient

2    and, therefore, better for the public.  The Board agreed and decided

3    in its Order, in terms retained on reconsideration, to require PRTC

4    to make all "commercially reasonable efforts" to directly connect

5    before it could be entitled to indirect-connection fees.

6        PRTC argues that the Board's decision on this matter is

7    inconsistent with, and preempted by, federal law, which specifies

8    that direct connection is not required.  (<u>See, e.g.</u>, Docket No. 26 at

9    21-33.)  PRTC relies on FCC precedent holding that the TCA does not

10   require direct connection and declining to impose general

11   interconnection obligations on wireless carriers, in favor of

12   "voluntary private agreements."  (Docket No. 26 at 21-22 (discussing

13   <u>In re Interconnection & Resale Obligations Pertaining to Commercial</u>

14   <u>Mobile Radio Servs.</u> (<u>CMRS Decision</u>), 15 F.C.C.R. 13523, 13528, 13533-

15   34 (2000)).)  In reaching that holding, the FCC reasoned that, at the

16   time of its decision, wireless providers typically lacked the

17   dominant market power that justifies regulatory intervention.  <u>See</u>

18   <u>CMRS Decision</u>, 15 F.C.C.R. at 13533-34.  PRTC also argues that the

19   FCC has expressly preempted local regulation of wireless

20   interconnection and that "coercion from state regulators" frustrates

21   the FCC's "voluntary private agreements" scheme.  (Docket No. 26 at

22   31-33.)

23       But PRTC's arguments turn on mischaracterizations of the Board's

24   decision. First, the Board fell short of imposing a direct-connection

1    requirement, as PRTC suffers no penalty for failure to do so.

2    Second, the Board's arbitration of an inter-carrier agreement does

3    not amount to regulation.  Furthermore, we find the Board's decision

4    consistent with FCC precedent on this matter. See, e.g., In re

5    Interconnection and Resale Obligations Pertaining to Commercial

6    Mobile Radio Servs., 10 F.C.C.R. 10666, 10687-88 (1995)

7    (acknowledging risk that "LEC-affiliated [wireless] carriers," like

8    Claro, might unreasonably deny efficient connection and suggesting

9    that said denial would justify regulatory intervention). Thus, we

10   reject PRTC's contention that the Board's decision on this issue

11   contravenes federal law.

12       PRTC also argues that the Board's determination was arbitrary

13   and capricious in that, having made a decision preempted by federal

14   law, the Board relied on factors Congress did not intend the Board to

15   consider. (Docket No. 26 at 33-34.)  This argument fails given our

16   rejection of PRTC's preemption argument.

17       **3.   Application of Reciprocal Compensation to Certain Calls**

18       This issue concerns whether the Board erred in rejecting

19   Centennial's proposal to apply a particular reciprocal-compensation

20   scheme to certain calls exchanged between Centennial and PRTC.  We

21   derive the following summary from the parties' submissions on this

22   issue. (See Docket Nos. 1 at 18-19; 28 at 12-13, 25-27; 32 at 7-13;

23   36 at 14-16; 37 at 14-16; 40 at 6-17; 54 at 2-9; 63 at 7-10; Joint

24   Exs. 39 at 21-25; 49 at 1-5.)

1        In 2005, PRTC and Centennial completed an interconnection

2   agreement that included terms on reciprocal compensation.  Reciprocal

3   compensation, required by federal law, is intercarrier compensation

4   for the completion of calls that are local – completed within a

5   geographically defined area – and that pass from an originating LEC

6   to a different, terminating LEC ("A-B calls").  See 47 U.S.C.

7   §§ 251(b)(5), 252(d)(2)(A)(i).  One issue PRTC and Centennial had to

8   resolve in 2005 was whose call-zone scheme would govern when they

9   completed A-B calls; Centennial maintained one, island-wide call

10  zone, while PRTC had ten.  Thus, under Centennial's scheme, all calls

11  completed intraisland would be local, whereas under PRTC's, any call

12  crossing over PRTC zone lines would be long distance.  The Board

13  resolved this question in favor of Centennial's scheme, determining

14  that when Centennial and PRTC completed A-B calls, Centennial's call-

15  zone scheme would govern such that all intra-island calls would be

16  considered local.

17       A new type of call is now at issue. In this case, both the

18  calling and the called parties have PRTC as their local carrier;

19  normally when they call each other, then, they pay long-distance fees

20  if they live in different PRTC call zones. But in this case, the

21  calling party has a long-distance plan through Centennial. As between

22  the carriers, this means that the call originates with PRTC, is

23  handed off to Centennial to transmit, then Centennial passes it back

24  to PRTC to terminate ("A-B-A call"). Currently, when Centennial

1    passes the call back to PRTC, it pays an access charge, which is paid

2    by any long-distance carrier terminating a call with an LEC.

3    Centennial, in turn, charges that calling customer long-distance

4    rates.

5         Centennial's argument before the Board, and before this court,

6    is that the reciprocal-compensation arrangement formulated under the

7    2005 Agreements should apply to these A-B-A calls.  It argues that,

8    given the intra-island character of the call, and the fact that

9    Centennial and PRTC interconnect to complete it, the earlier decision

10   setting Centennial's as the governing call zone applies.  This would

11   eliminate Centennial's obligation to pay the access charge to PRTC,

12   though Centennial would continue to charge its customer long-distance

13   rates for that particular call.

14        The Board rejected Centennial's proposal, deciding, in effect,

15   to apply the formulated reciprocal-compensation scheme to only A-B

16   calls.  In defending that rejection, the Board points to language in

17   federal law that contemplates only A-B calls, which the Board dubs

18   "local" calls, in establishing requirements for reciprocal

19   compensation.  See, e.g., 47 U.S.C. § 252(d)(2)(A)(i) ("[Reciprocal

20   compensation arrangements must] provide for the mutual and reciprocal

21   recovery by each carrier of costs associated with the transport and

22   termination on each carrier's network facilities of calls that

23   originate on the network facilities of the other carrier . . . .").

24   Further, the Board points to FCC rulings that limit reciprocal

1   compensation to local calls to support its decision that reciprocal

2   compensation should not apply to calls falling outside its definition

3   of local calls. See, e.g., In re Implementation of Local Competition

4   Provisions in TCA (Local Competition Order), 11 F.C.C.R. 15499,

5   16013-14 (1996).

6        Centennial disputes the Board's decision, arguing (1) given the

7   purely geographic understanding of "local" under federal and Puerto

8   Rico law, the Board erred in taking into account Centennial's role in

9   the interconnection when classifying A-B-A calls as nonlocal (Docket

10  No. 32 at 8-13); and (2) under a recent FCC ruling, even long-

11  distance calls must fall under reciprocal compensation arrangements

12  (Docket No. 54 at 3-8). We examine each argument in turn.

13       Federal law supports the distinction drawn by the Board between

14  A-B calls and others. In 1996, the FCC explored the difference

15  between calls that require reciprocal compensation and those that

16  still may fall under an access-charge regime. See Local Competition

17  Order, 11 F.C.C.R. at 16013-14. For those that require reciprocal

18  compensation, the FCC contemplated only the scenario in which the

19  originating and terminating carriers are different. See id.

20  Moreover, the FCC noted state commissions' "authority to determine

21  what geographic areas should be considered 'local areas' for the

22  purpose of applying reciprocal compensation obligations," and to

23  determine "whether intrastate access charges should apply to the

24  portions of [LECs'] local service areas that are different." Id.

Civil No. 08-2436 (JAF)                                           -17-

1    These provisions justify the Board's refusal to extend the

2    reciprocal-compensation scheme it formulated for A-B calls.

3          As to Centennial's argument that reciprocal compensation should

4    apply regardless of whether the calls are considered local or long

5    distance, given new FCC precedent, we again find the distinction

6    between A-B calls and others to be warranted.[8]  See In re High-Cost

7    Universal Serv. Support, 24 F.C.C.R. 6475, 6479-83 (2008).  While the

8    FCC did broaden the application of reciprocal compensation to long-

9    distance calls, it maintained the distinction between A-B calls and

10   others. See id. at 6481-82 (considering whether long-distance traffic

11   at issue was terminated by carrier seeking reciprocal compensation).

12   Thus, the Board did not err even under the new FCC ruling in refusing

13   to apply reciprocal compensation to A-B-A calls.

14         Centennial argues that, regardless of federal law, Puerto Rico

15   law compels the Board to label these calls as local, again relying on

16   the argument that "local" is an entirely geographic label. (Docket

17   No. 32 at 7 (discussing 27 L.P.R.A. § 265a(cc), which defines "local

18   telecommunications service" as "telecommunications service rendered

19   within a local area").) The Board rejected this argument in its Order

_____

      [8] The Board argues that Centennial is precluded from arguing the
effect of the new FCC precedent, as Centennial failed to raise it either
during the administrative proceedings or in its earlier briefs in the
instant case.  (Docket No. 63 at 8-9.)  As to the scope of our review vis-
à-vis arguments raised during the administrative proceedings, we again
reject the Board's argument. See supra note 6. Likewise, Centennial's
failure to raise this argument earlier in this case cannot bar our
consideration of FCC rulings relevant to this issue.

1   on Reconsideration, finding that the Puerto Rico legislature did not

2   have this particular question in mind when it wrote the definition of

3   local traffic.  Thus, it found said definition no impediment to its

4   decision, guided by federal law, to treat A-B calls specially. We

5   find the Board's decision under Puerto Rico law reasonable and, thus,

6   decline to disrupt it on that ground.

7        **4.   <u>Restriction on Types of Traffic Allowed</u>**

8        This  issue  concerns  whether  the  Board  erred  in  rejecting

9   Centennial's proposal that the 2008 Agreements explicitly allow PRTC

10  and  Centennial  to  exchange  "all  lawful  traffic"  under  their

11  interconnection arrangements instead of enumerating particular types

12  of traffic allowed. We derive the following summary from the parties'

13  submissions on this issue. (<u>See</u> Docket Nos. 1 at 16-18; 28 at 13-15,

14  23-15; 32 at 13-20; 36 at 11-14; 37 at 16-20; 40 at 17-31; 54 at 9-

15  12; Joint Exs. 39 at 9-16; 49 at 5-7.)

16       Centennial  and  PRTC's  agreements  specifically  enumerate  the

17  types of traffic that they are allowed to exchange at their meet

18  points, the physical points at which they interconnect pursuant to 47

19  U.S.C. § 251 to exchange traffic.  Any type of traffic not enumerated

20  is prohibited.  Centennial proposed that the agreements be changed to

21  allow the exchange of "all lawful traffic" at the Centennial-PRTC

22  meet points, without restriction as to types.  Centennial reasoned

23  that federal law and policy required, or at least permitted, carriers

24  to use the meet points for any type of traffic these could support.

The Board found that federal law afforded no absolute right to use § 251 meet points for any service. (Joint Ex. 39 at 14.) The Board explained that while federal law supports the "efficient and expansive use of facilities," "[t]here are constraints on the use of interconnection arrangements" established under § 251.  (Id. at 15.) For example, the Board explained, the FCC determined that § 251(c)(2) interconnections could not be used to terminate certain long-distance traffic,[9] see Local Competition Order, 11 F.C.C.R. at 15998-99, but that § 251 interconnections could be used to exchange information services, see 47 C.F.R. § 51.100(b). (Joint Ex. 39 at 13-15; 49 at 7.)

Centennial argues that the Board's determination contravenes federal law, which promotes the maximum use of physical meet points, once established, by LECs. (Docket No. 32 at 13-20.)  But we find no error in the Board's application of federal law on this issue. Insofar as the FCC expressly expanded the type of traffic allowed under a § 251 interconnection to include "information services," we find no legal error in the Board's decision to match that expansion without going further.  While Centennial cites FCC language

---

[9] Centennial contends that the Board misapplied this federal rule that long-distance carriers may not obtain interconnection under § 251(c)(2) for the sole purpose of terminating long-distance traffic; Centennial is not a long-distance carrier seeking interconnection but rather an LEC seeking to make maximum use of meet points. (Docket No. 32 at 18 & n.41, 19; see also Docket No. 37 at 18.)  As this dispute is collateral to the question before us – whether federal law permits the Board to restrict the type of traffic exchanged under § 251 interconnection arrangements – we need not resolve it here.

Civil No. 08-2436 (JAF)                                          -20-

1    encouraging expansive use of physical facilities accessed under

2    § 251(d), see, e.g., In re Review of § 251 Unbundling Obligations of

3    Incumbent LECs, 18 F.C.C.R. 16978, 17072-73, such language is

4    inapposite to interconnection arrangements established under

5    §§ 251(a)(1) and 251(c)(2).

6         A secondary issue under this heading is whether Centennial and

7    PRTC's list of allowed traffic should include Voice over Internet

8    Protocol ("VoIP") traffic.  The parties agree that VoIP traffic does

9    not fall into any of the categories already enumerated, yet

10   Centennial and PRTC are allowed to exchange VoIP traffic.  Since the

11   Board decided that Centennial and PRTC must maintain a list of

12   allowed traffic, thereby excluding all other traffic, its decision to

13   allow VoIP traffic without including it on the enumerated list is

14   arbitrary and capricious. Thus, the Board erred in excluding VoIP

15   traffic from the enumerated list, to the extent that VoIP traffic

16   does not already fall under an enumerated category.

17        **5.   Voice over Internet Protocol**

18        This issue concerns whether the Board erred in rejecting

19   Centennial's proposal to change the means by which PRTC and

20   Centennial rate the VoIP traffic they exchange. We derive the

21   following summary from the parties' submissions on this issue. (See

22   Docket Nos. 1 at 15-20; 28 at 16-17, 27-29; 32 at 20-25; 36 at 16-18;

23   37 at 20-23; 40 at 31-42; 54 at 12-14; 64; 65; Joint Exs. 39 at 9-16;

24   49 at 5-7.)

1      Centennial and PRTC exchange VoIP traffic, whereby callers use

2      a "high-speed Internet connection, along with specialized equipment

3      and software, to make and receive telephone calls." (Docket No. 32 at

4      20.)  During arbitration, Centennial proposed that the Board clarify

5      an ambiguity arising from the difficulty of identifying the

6      origination point of VoIP traffic.  This difficulty frustrates the

7      carriers' attempt to classify VoIP traffic as local or long distance

8      for the purpose of applying appropriate rates.  Centennial argued

9      that the point at which the traffic switches to normal telephone

10     traffic should serve as a proxy for origination; Centennial's

11     proposal would render all VoIP traffic local, however, as such

12     switching for Puerto Rico VoIP traffic occurs within Puerto Rico, <u>see</u>

13     <u>supra</u> Part IV.3.  Centennial submits that a presumption that VoIP

14     calls are local, rather than long distance, is supported by its

15     having identified enough VoIP-traffic origination points to know that

16     the majority of VoIP calls it transmits originate within Puerto Rico.

17     The Board rejected Centennial's proposal, opting instead to

18     retain the regime Centennial and PRTC already used for rating VoIP

19     traffic. Under that regime, calls whose origination can be identified

20     are rated based on that origination point;[10] for the remaining,

21     unidentifiable calls, the carriers presume that the call is long

---

[10] The Board reasoned that the identifiable calls would be the vast
majority of VoIP calls, as Centennial had admitted its ability to identify
the origination point of many VoIP calls.  <u>See, e.g.</u>, Joint Ex. 49 at 9.)

Civil No. 08-2436 (JAF)                                            -22-

1    distance.  The Board maintained the latter presumption, relying on

2    the FCC's estimate that the majority of VoIP calls are long distance.

3         Centennial challenges the Board's decision, claiming that it

4    amounts to a refusal to arbitrate an intercarrier-compensation scheme

5    for VoIP traffic (Docket Nos. 32 at 23-25; 64) and ignores

6    Centennial's factual showing that VoIP traffic in Puerto Rico is more

7    likely to be local than long distance. We decline to upset the

8    Board's decision on either ground.  First, the Board's decision to

9    maintain the existing intercarrier-compensation scheme does not

10   amount to a failure to arbitrate the issue. Second, the Board's

11   treatment of Centennial's factual showing was grounded in a

12   reasonable consideration of the evidence before it. In short, the

13   Board's decision on this issue neither contravenes federal law nor

14   was arbitrary and capricious.

15                                   **V.**

16                               **Conclusion**

17        For the reasons stated herein, we hereby **GRANT IN PART**

18   Centennial's motion for summary judgment (Docket No. 30); **VACATE IN**

19   **PART** the Board's Order and Order on Reconsideration (Joint Exs. 39;

20   49); and **DENY IN PART** the Board's motion (Docket Nos. 27), as to the

21   Board's exclusion of VoIP traffic from the enumerated list of

22   allowable traffic, see supra Part IV.B.4.  As to all other issues,

23   see supra Part IV.B, we **GRANT IN PART** the Board's motion for summary

Civil No. 08-2436 (JAF)                                           -23-

1     judgment (Docket No. 27); **DENY** PRTC's motion (Docket No. 25); and

2     **DENY IN PART** Centennial's motion (Docket No. 30).

3          **IT IS SO ORDERED.**

4          San Juan, Puerto Rico, this 25th day of November, 2009.

5                                         s/José Antonio Fusté
6                                         JOSE ANTONIO FUSTE
7                                         Chief U.S. District Judge